UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARSH USA INC., ET AL.,<br><br>                   Plaintiffs,<br><br>-against-<br><br>RAYMOND FALK,<br><br>                   Defendant. | 12-CV-3044 (LTS) (HBP) |

## DECLARATION OF RAYMOND FALK

1. My name is Raymond Falk. I am over twenty-one (21) years of age, and I am competent in all respects to make this declaration. I have personal knowledge of every fact contained in this declaration because they relate to matters in which I personally participated or personally observed, and declare that they are true and correct.

2. I worked for Marsh USA Inc. ("Marsh") as an insurance broker between December 2005 and February 17, 2012, when I voluntarily resigned from my employment with Marsh.

3. I am a citizen and current resident of the State of Louisiana. Although I was born in New York, I have lived in New Orleans, Louisiana since 1972, except for a nine (9) month period in 1979-1980 during which I worked in Chicago, Illinois. Since moving to New Orleans in 1972, I have not conducted any personal business in New York. I have no office in New York. I have not acquired or owned property or maintained a bank account in the State of New York. I do not hold any assets in New York. Also, I do not solicit business, either in person or by mail, in New York. I have not committed any tort, or breached any contract, in New York.

4. Based upon my work to broker the business, Marsh renewed the Northeast Ship Repair, Inc. account for a one-year policy term effective from October 1, 2011 to September 31, 2012. This renewal was only for Northeast Ship's United States Longshore and Harborworkers' Compensation Act and State Workers' Compensation insurance coverage. In July 2011, Marsh lost all of Northeast Ship's other insurance coverages, including property, automobile, contractors equipment, marine general liability, and ship repairer's legal liability insurance coverage to a Boston, Massachusetts broker. Actually, I was responsible for Marsh keeping the United States Longshore and Harborworkers' Compensation Act and State Workers' Compensation insurance coverage portion of the account Northeast Ship renewed. When I informed my boss, Robert Monsted, of my retention of this portion of the account, Mr. Monsted told me the account was "too small" and would be unprofitable for Marsh to keep this portion of the account.

5. Per the commission terms of the placements, Marsh receives about $45,000 in annual revenue from the account. Thus, from October 1, 2011 until I resigned in February of 2012, Marsh would have received five months of the total twelve months of commission for this account, or approximately $18,750 of the total annual $45,000 in commissions. In Louisiana, insurance brokers are required to receive all commissions they would have received throughout the policy term, even if the client switches or amends its producer of record in the middle of a policy term. Accordingly, even though Northeast Ship changed brokers after February, Marsh is entitled to continue to receive commissions due under the policy until it expires on September 30, 2012. Even if Marsh did not receive those commission payments after February 2012, as it is entitled, its loss related to those commissions would not be $45,000, as it has pled but, rather, at most, approximately $26,250 for the last seven-twelfths of the policy period, from March through September.

6. Marsh required me to sign a non-solicitation agreement when I joined Marsh in 2005. This agreement does not contain a New York forum selection clause. Later, in 2007 and 2009, well after I started working for Marsh, Marsh required me to sign two additional agreements that contain forum selection clauses. As an employee already established and working for the company, and with no prior warning of the requirement that I sign these new agreements, there was a great disparity in bargaining power between Marsh and me. It was made clear to me that I was required to sign the documents if I wanted to keep my job and I had no viable option for replacement employment when I was presented with these documents. I did not have any input as to the terms of the documents, nor was I allowed to alter or amend the terms to which I did not wish to agree. To be sure, I had never even been asked to agree or ratify, and I certainly never agreed to or ratified Marsh's forum selection clauses after the date on which Marsh claims I breached the restrictive covenants in my employment agreements.

7. Because the many different agreements, many with different terms, Marsh required me to sign while employed left my rights and responsibilities upon my resignation unclear, at my request my Louisiana lawyers filed a declaratory judgment action on my behalf against Marsh on February 17, 2012, two months before Marsh filed this instant lawsuit against me in New York. In an effort to resolve any differences as quickly and reasonably as possible, I gave Marsh a copy of my lawsuit and I specifically told Marsh I would not serve Marsh at that time "in hopes that we might be able to amicably resolve the issues presented in it." My lawsuit and this lawsuit both concern the enforceability of certain restrictive covenants Marsh seeks to enforce against me. Because I was optimistic we could reconcile our positions informally, my lawyers purposefully did not advance the Louisiana action until I learned of Marsh's apparently reactionary lawsuit filed against me in New York.

8. As for Marsh's allegations against me, I did not have any substantial contacts with New York and there are no significant contacts or events that occurred in New York. Marsh hired me to work in its New Orleans office. I am a Louisiana resident. I conducted business for Marsh from New Orleans throughout the state of Louisiana and a handful of other states. Mr. Monsted and I worked together in Marsh's New Orleans office.

9. Importantly in light of Marsh's allegations in this lawsuit, Marsh's 2007 Non-Solicitation Agreement does not list Boston, Suffolk County, Massachusetts, where Northeast Ship is located. Northeast Ship's Chief Financial Officer, Bruce Zaniol, and its Risk Manager, Bill Rowan, were my contacts at Northeast Ship. Both Messrs. Zaniol and Rowan work in Boston, Massachusetts.

10. Marsh identifies Guy Claveloux, Marsh's "head of Marsh's Global Marine Group," as someone who claims to have interviewed me. I do not recall ever meeting with Mr. Claveloux for any interview and certainly did not travel to New York to do so. Marsh also refers to Laura Cooper, Marsh's "Assistant Vice President of Talent Acquisition and Career Mobility." Marsh says Ms. Cooper mailed me an offer letter from New York to my home in New Orleans, Louisiana. I do not recall ever meeting Ms. Cooper or even talking to Ms. Cooper.

11. All of the relevant events in this matter transpired almost entirely in Louisiana. While Marsh appears to stretch the materiality of any contact with the State of New York by claiming Ms. Cooper mailed me a job offer letter from New York to Louisiana, there were no contract negotiations that occurred in New York. To the contrary, upon the recommendation of a London broker who is a mutual friend of mine and Mr. Monsted's, Mr. Monsted called me in Louisiana on a couple occasions to discuss my interest in coming to work for Marsh. All negotiations, to the extent there were any, occurred between me and Mr. Monsted in Louisiana. Moreover, all the key events relating to my execution of the offer letter, where I performed my contract, and where the alleged breach occurred took place in New Orleans, Louisiana.

12. To be sure, Marsh's allegation that I left "loose ends" when I resigned is nonsensical. Marsh alleges I did not complete renewals for two of Marsh's clients before I resigned. This is completely false. Marsh is referring to the Hornbeck and Intermarine accounts. I purposefully stayed on at Marsh to see that I closed these two account renewals.

13. Hornbeck is headquartered in Covington, Louisiana. I personally delivered a renewal presentation to Sam Giberga, Executive Vice President and General Counsel, weeks before I resigned from Marsh. On Tuesday or Wednesday before I resigned, I informed Mr. Giberga and Stephen Johnson, Hornbeck's Claims Manager, that the renewal was complete. Both Messrs. Giberga and Johnson work in Louisiana.

14. Intermarine, LLC is a privately held company headquartered in New Orleans, Louisiana. But since Hurricane Katrina, all of Intermarine's operations, except for a portion of the sales department, are based in its Houston, Texas office. All Intermarine executive officers live in the Houston area and work in Houston. On Thursday before I resigned, I completed the renewals for Intermarine. The renewals were finalized on Thursday morning, February 16, 2012, when Intermarine's Chief Financial Officer, Mike Dumas, chose between one of three options I offered Intermarine for protection and indemnity insurance. Once Mr. Dumas chose which option he preferred, I completed the renewal (the only open item) and informed Christian Daigle, General Counsel, the renewals were completed. Both Messrs. Dumas and Daigle work in Houston, Texas.

15. I do not maintain any continuous or systematic contacts with the State of New York. Furthermore, I had no expectation of being haled into court in New York for my role as an employee for Marsh in Marsh's New Orleans office.

16. Additionally, I would be unduly burdened by litigating this case in, and having to travel to New York. Also, litigation in New York would be unduly costly and inconvenient for me. I reside and work in Louisiana. Most, if not all, of the witnesses and evidence relating to my work for Marsh and Marsh's claims made against me are located in Louisiana. The transactions, events, and occurrences regarding my employment, including the transactions of which Marsh complains, did not occur in New York.

17. I declare under penalty of perjury that all of the foregoing is within my own personal knowledge and is true and correct.

Executed on May 16, 2012.

_____
RAYMOND FALK

4